### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE


Lori Precourt, Administrator
of the Estate of Carolyn Black

     v.                             Civil No. 10-cv-337-LM

Fairbank Reconstruction Corp.,
d/b/a Fairbank Farms; Greater
Omaha Packing Company, Inc.; and
Shaw's Supermarkets, Inc.


### O R D E R

Lori Precourt, as the administrator of the estate of her
mother, Carolyn Black, asserts fourteen claims,[1] based on
allegations that Black died as a result of eating contaminated
beef that was supplied by Greater Omaha Packing Company, Inc.
("GOPAC") to Fairbank Reconstruction Corp. ("Fairbank"), which
processed and distributed it, in the form of ground beef, to
Shaw's Supermarkets ("Shaw's"), which sold ground beef to Black.
Specifically, Precourt asserts claims for: (1) strict products
liability, against Fairbank (Count I), GOPAC (Count II), and
Shaw's (Count III); (2) breach of warranty, against Fairbank
(Count IV), GOPAC (Count V), and Shaw's (Count VI); (3)
negligence, against Fairbank (Count VII), GOPAC (Count VIII),
and Shaw's (Count IX); (4) violation of the New Hampshire

---

[1] In Precourt's Second Amended Complaint, document no. 105,
her fourteen claims are numbered I-X and XII-XV.

Consumer Protection Act ("CPA"), against Fairbank (Count X),
GOPAC (Count XII), and Shaw's (Count XIII); and (5) enhanced
compensatory damages, against GOPAC (Count XIV) and Fairbank
(Count XV).  Fairbank and Shaw's, in turn, assert crossclaims
for contribution and indemnity against GOPAC as to all four of
Precourt's theories of liability.

Before the court are four motions for summary judgment.  In
document no. 53, GOPAC seeks summary judgment on Precourt's
claims for breach of warranty (Count V), violation of the CPA
(Count XII), and enhanced compensatory damages (Count XIV).  In
document no. 57, Precourt seeks summary judgment on its strict-
liability claims against all three defendants (Counts I-III).
In document no. 58, Fairbank and Shaw's seek summary judgment on
their crossclaims against GOPAC.  And, in document no. 73, GOPAC
seeks summary judgment on all of Precourt's claims and all of
the crossclaims asserted by Fairbank and Shaw's.  Each motion is
duly opposed.

### Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to a judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  "The object of summary judgment is to 'pierce
the boilerplate of the pleadings and assay the parties' proof in

order to determine whether trial is actually required.'" <u>Dávila v. Corporación de P.R. para la Diffusión Pública</u>, 498 F.3d 9, 12 (1st Cir. 2007) (quoting <u>Acosta v. Ames Dep't Stores, Inc.</u>, 386 F.3d 5, 7 (1st Cir. 2004)). "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Noonan v. Staples, Inc.</u>, 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"Once the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer 'definite, competent evidence to rebut the motion,'" <u>Meuser v. Fed. Express Corp.</u>, 564 F.3d 507, 515 (1st Cir. 2009) (citing <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991)), and "cannot rest on 'conclusory allegations, improbable inferences, [or] unsupported speculation,'" Meuser, 564 F.3d at 515 (quoting <u>Welch v. Ciampa</u>, 542 F.3d 927, 935 (1st Cir. 2008)). When ruling on a party's motion for summary judgment, a trial court "constru[es] the record in the light most favorable to the nonmovant and resolv[es] all reasonable inferences in [that] party's favor." <u>Meuser</u>, 564 F.3d at 515 (citing <u>Rochester Ford Sales, Inc. v. Ford Motor Co.</u>, 287 F.3d 32, 38 (1st Cir. 2002)).

**Background**

Before describing the relevant factual background, the court is compelled to point out one particularly unhelpful aspect of GOPAC's summary-judgment practice.  In Precourt's memorandum in support of her motion for summary judgment, document no. 57-1, she "incorporate[s] a short and concise statement of material facts, supported by appropriate record citations, as to which [she] contends there is no genuine issue to be tried," as required by Local Rule 7.2(b)(1).  In its objection, GOPAC does not "incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which [it] contends a genuine dispute exists so as to require a trial," LR 7.2(b)(2).

Instead, GOPAC provides its own factual narrative.  Then it addresses Precourt's statement of facts in the following way.  In response Precourt's statement that "[t]he . . . ground beef purchased by Ms. Black on September 24, 2009 was contaminated with E. coli O157:H7 at the time it left the control of Shaw's," Pl.'s Mem. of Law (doc. no. 57-1), at 5, GOPAC states: "Precourt contends that on September 24, 2009, Ms. Carolyn Black purchased E. coli O157:H7 contaminated ground beef produced by Fairbank at the Shaw's Supermarket in Seabrook, New Hampshire."  Def.'s Obj. (doc. no. 83), at 5.

4

GOPAC can either concede the facts stated by Precourt or contest them, with citations to the record.  GOPAC's manner of responding to Precourt's factual allegations, i.e., not addressing the facts directly, but merely reporting what it says the other parties said about the facts, is both inappropriate and ineffective.  More to the point, GOPAC needlessly complicates the court's job of ascertaining which facts are disputed and which are not.  In any event, all properly supported material facts that GOPAC does not properly oppose shall be deemed admitted.  See LR 7.2(b)(2).  That said, the court turns to the relevant factual background.

On September 24, 2009, Carolyn Black purchased a package of ground beef from Shaw's, in Seabrook, New Hampshire.  That beef was contaminated with E. coli O157:H7.  Black consumed the contaminated beef, and on October 4, was admitted to the hospital.  She died on October 30, 2009, from respiratory failure, multisystem failure, and hemolytic uremic syndrome/thrombotic thrombocytopenic purpura, all directly resulting from her exposure to E. coli O157:H7.

The contaminated ground beef Black purchased from Shaw's was processed and distributed to Shaw's by Fairbank on September 16, 2009.  In September of 2009, GOPAC supplied Fairbank with raw beef in the form of "beef trim."

The relationship between GOPAC and Fairbank was governed by
an agreement known as the Fairbank Guarantee, that includes the
following relevant provision:

> The Seller [GOPAC] agrees to indemnify and hold
> harmless American Foodservice Corporation and American
> Fresh Foods and its' affiliates [including Fairbank],
> their Officers, Directors, employees and agents
> (herein referred to as "Buyer") harmless from all
> claims, damages, causes of action, suits, proceedings,
> judgments, charges, losses, costs, liabilities and
> expenses (including attorneys' fees) arising from any
> products (raw materials) as delivered to Buyer by
> Seller, that do not comply with the provisions of the
> Buyers' Raw Material Specifications or that are caused
> by the negligence or intentional misconduct of Seller,
> its' Agents and employees.

Stevens Aff., Ex. H. (doc. no. 60-8), at 3.  Fairbank's Domestic
Beef Raw Material Specifications include an expectation that all
of its "beef raw material suppliers [are] to produce the
cleanest possible raw materials and to comply with the USDA's
'Zero Tolerance' standards for fecal coliform bacteria."  Id. at
6.  Those specifications list a target level of "negative" for
E. coli O157:H7.  See id.

Margaret Long and Alice Smith also purchased ground beef
from Shaw's that had been processed by Fairbank, and that was
contaminated with E. coli O157:H7.[2]  Like Black, both Long and
Smith were sickened by E. coli O157:H7.  The E. coli O157:H7

---

[2] Long purchased her contaminated ground beef on September
19, 2009, from a Shaw's in Augusta, Maine.  Smith purchased her
contaminated ground beef on September 23, from a Shaw's in
Portland, Maine.

cultured from Long and Smith was a genetic match for the E. coli cultured from Black and a number of other victims of what the Center for Disease Control ("CDC") has called the "Northeast Outbreak."  The CDC traced the Northeast Outbreak to ground beef processed and distributed by Fairbank.  On October 31, Fairbank recalled 545,600 pounds of ground beef, including the ground beef that Shaw's had sold to Long, Smith, and Black.

Long and Smith each sued Fairbank in the United States District Court for the District of Maine.  They asserted claims for strict products liability, breach of warranty, and negligence.  Fairbank brought in GOPAC as a third-party defendant, seeking contribution and indemnification.  At some point, Fairbank settled with Long and Smith and went to trial on its indemnification claim against GOPAC.  On November 14, 2011, after a jury trial, judgment was entered in favor of Fairbank on its claim that it was entitled to indemnification from GOPAC for Long's and Smith's claims for breach of warranty.  In a special verdict form, the jury in the Maine case found that: (1) "GOPAC delivered adulterated raw beef containing E. coli O157:H7 to Fairbank in September 2009," Stevens Aff., Ex. F (doc. no. 60-6), at 2; (2) "Fairbank acted as a reasonable buyer in using the adulterated raw beef delivered by GOPAC in September 2009," id.; and (3) the contaminated beef GOPAC delivered to Fairbank was

ground by Fairbank and later consumed by both Long and Smith, thus causing their injuries, see id. at 2-3.  Post-trial motions in the Maine case are currently pending.

The court concludes this section with the following recital of admissions by Fairbank and Shaw's.  Shaw's admits that "the ground beef purchased by Ms. Black on September 24, 2009 was contaminated with E. coli O157:H7 at the time it left the control of Shaw's Supermarkets, Inc."  Pl.'s Mot. Summ. J., Ex. F (doc. no. 57-8), at 2.  Fairbank admits that: (1) "the ground beef purchased by Ms. Black on September 24, 2009 was contaminated with E. coli O157:H7 at the time it left the control of Fairbank Reconstruction Corp.," id., Ex. E (doc. no. 57-8), at 3; (2) "the E. coli O157:H7 cultured from Ms. Black on October 6, 2009 was a genetic match to that shared by those within the cluster of E. coli O157:H7 infections in New England," id. at 4; (3) "Ms. Black's E. coli O157:H7 infection in October 2009 resulted from consumption of the ground beef she purchased on September 24, 2009 that had been processed and sold by Fairbank Reconstruction Corp.," id.; and (5) "Fairbank, as a result of GOPAC's acts and omissions, is liable to plaintiff for any injuries to Ms. Black caused by the consumption of contaminated ground beef," id. at 6.

**Discussion**

As noted, four motions for summary judgment are currently pending.  The court discusses each of them below, but not in the order in which they were filed.

A. Document No. 73

In document no. 73, which is chronologically GOPAC's second motion for summary judgment, GOPAC seeks summary judgment on all five of Precourt's claims against it as well as the four crossclaims asserted by Fairbank and Shaw's.  GOPAC argues that: (1) the only evidence Precourt, Fairbank, and Shaw's (collectively "plaintiffs") have offered linking GOPAC to the contaminated ground beef that Black purchased is an expert report by Thomas Hoffman; (2) the factual basis for Hoffman's report was "wholly discredited" in the Maine trial; and (3) without the discredited Hoffman report, plaintiffs cannot prove the causation elements of any of their claims.  GOPAC's basic point is that Hoffman's is the only expert report that analyzes "the bin, lot or Shipping Invoice numbers purporting to trace raw materials from GOPAC through Fairbank to Shaw's and ultimately Ms. Black," Def.'s Mem. of Law (doc. no. 73-1), at 3, and that without such analysis, plaintiffs cannot prove their claims against it.

9

In response, plaintiffs make a number of points: (1) GOPAC's motion was filed two weeks after the deadline in the scheduling order; (2) Hoffman's report was never entered into evidence in the Maine trial; (3) Hoffman was never called as a witness in the Maine trial; (4) Hoffman's purportedly discredited report was rehabilitated through testimony and exhibits during the Maine trial, and GOPAC's reliance on the alleged error in Hoffman's report was necessarily rejected by the jury in Maine; (5) Hoffman has been withdrawn as an expert witness in this case; and (6) plaintiffs have produced substantial evidence linking GOPAC's beef to Black's death.

Many of plaintiffs' arguments appear to be sound.  However, GOPAC's motion must be denied for a more fundamental reason: the "Statement of Material Facts" in GOPAC's memorandum of law does not, in fact, state any facts.  It seems axiomatic that for summary-judgment purposes, a statement of facts is a statement about the conduct of the parties on which a legal claim is based.  Here, GOPAC's memorandum of law states no such facts.  Rather, in its eleven-paragraph "Statement of Material Facts," the first six paragraphs all describe plaintiffs' claims.  For example, the first paragraph says: "Precourt, Fairbank and Shaw's all contend that on September 24, 2009, Ms. Carolyn [B]lack purchased ground beef at the Shaw's Supermarket in

Seabrook, New Hampshire."  Def.'s Mem. of Law (doc. no. 73-1),
at 2.  That is not a statement about anything Fairbank, Shaw's,
or Black did prior to Precourt's filing suit; it is a statement
about what plaintiffs are claiming in this case.  Similarly, the
next two paragraphs describe plaintiffs' disclosure of expert
witnesses, while the final three paragraphs consist of GOPAC's
characterization and analysis of plaintiffs' expert reports.
Those are not facts; they are, if anything, legal arguments.
Because GOPAC's memorandum includes no statement of material
facts, and the motion it supports is untimely, GOPAC's second
motion for summary judgment, document no. 73, is necessarily
denied.

        If those were not reasons enough to deny GOPAC's motion,
granting it would require the court to weigh parties' evidence
on causation, and determine the truth of that matter, which is
not the proper role of a court considering a motion for summary
judgment.  See Noonan, 556 F.3d at 25.  While GOPAC asserts that
plaintiffs have produced no evidence other than the Hoffman
report to connect it with the contaminated ground beef that
Black purchased from Shaw's, that assertion is manifestly
incorrect.  Fairbank and Shaw's have produced an expert report
containing the following opinion:

        To a reasonable degree of scientific certainty,
        product that GO PAC produced on September 11, 2009 and

> shipped to Fairbank Farms was the source of the E.
> coli O157:H7 contamination associated with the
> plaintiffs' illness and the outbreak resulting in the
> recall of Fairbank Farms ground beef on October 31,
> 2009.

Def.'s Obj., Ellenbecker Aff., Ex. I (doc. no. 82-10), at 9.

GOPAC has produced contrary evidence, including trial testimony

from the Maine case showing that a person in California who had

eaten no beef at all was sickened by E. coli O157:H7 that

genetically matched the E. coli that sickened Long, Smith, and

Black.  See id., Ex. B (doc. no. 83-3), at 32-33.  Because the

court could not grant GOPAC's motion without resolving the

factual dispute described above, that motion must be denied.

    If there were a rule requiring a plaintiff in Precourt's

position to prove the chain of custody of a defective product

through expert testimony then, perhaps GOPAC's motion might have

merit.[3]  But GOPAC identifies no such rule.  GOPAC is not even

arguing about the content of Hoffman's opinion; it is arguing

about bin numbers, lot numbers, and/or shipping invoice numbers,

factual evidence that appears to have made it into the Maine

trial even though Hoffman did not testify.  In short, GOPAC's

argument for summary judgment misses the mark by a wide margin.

---

[3] As an example of such a rule, New Hampshire requires a
plaintiff in a medical-injury action to produce expert testimony
on the standard of care, the defendant's failure to meet that
standard of care, and causation.  See N.H. Rev. Stat. Ann. §
507-E:2, I.

B. Document No. 57

In document no. 57, Precourt moves for summary judgment on Counts I-III, its claims for strict products liability against each of the three defendants.  GOPAC objects, while Fairbank and Shaw's have filed a response for the limited purposes of commenting on Precourt's reliance on the Hoffman report and arguing that GOPAC's liability for Black's death was conclusively established in the Maine case.[4]

New Hampshire has "adopted the doctrine of strict liability of manufacturers for product defects in section 402A (1) of the Restatement (Second) of Torts."  Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 831 (2005) (citing Royer v. Catholic Med. Ctr., 144 N.H. 330, 331 (1999); Price v. BIC Corp., 142 N.H. 386, 388 (1997)).  The Restatement, in turn, provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused to the ultimate user or consumer . . . if
>
>   (a) the seller is engaged in the business of selling such a product, and
>
>   (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A (1965).

---

[4] Fairbank and Shaw's also deny any negligence and reserve their right to contest the nature and amount of damages.

### 1. Counts I and III

Counts I and III are Precourt's strict-liability claims against Fairbank and Shaw's.  Given the admissions those parties have made, and their response to Precourt's summary-judgment motion, which does not deny liability but merely reemphasizes their contention that any liability against them flows, in its entirety, to GOPAC, the court concludes that Precourt is entitled to summary judgment on Counts I and III of her amended complaint.

### 2. Count II

Count II is Precourt's strict-liability claim against GOPAC.  In reliance on the doctrine of collateral estoppel, Precourt argues that she is entitled to summary judgment on that claim because: (1) the jury in the Maine case found that "GOPAC delivered adulterated ground beef containing E. coli O157:H7 to Fairbank in September 2009," Stevens Aff., Ex. F (doc. no. 60-6), at 2; (2) the adulterated beef GOPAC delivered to Fairbank was later consumed by Long and Smith, and caused them injuries, see id. at 2-3; (3) GOPAC admitted, in a pleading in the Maine case, that "Long and Smith were afflicted by what became known as the 'Northeast Outbreak' of cases, investigated by the U.S. Center for Disease Control ('CDC'), which traced the source of the illness to ground beef produced by Fairbank," Pl.'s Mem. of

Law, Ex. I (doc. no. 57-11) ¶ 3; and (4) GOPAC also admitted, in the same pleading, that "[l]ike Plaintiffs Smith and Long in this litigation, Ms. Black was among the patients determined by the CDC to be part of the Northeast Outbreak, which the CDC traced back to Fairbank Farms' ground beef," id. ¶ 7.  Precourt also points out that it is undisputed that the E. coli O157:H7 that sickened Black was a genetic match to the E. coli that sickened Long and Smith.

Without providing the short and concise statement of material facts required by Local Rule 7.2(b)(2), GOPAC contends that Precourt is not entitled to summary judgment because the existence of at least two areas of factual dispute: "(1) whether the contaminated ground beef consumed by Ms. Black actually contained any raw beef materials from GOPAC; and (2) if so, whether these materials were contaminated with E. coli O157:H7." Def.'s Mem. of Law (doc. no. 83), at 1 (emphasis in the original).  GOPAC then devotes a considerable portion of its objection to identifying impediments to Precourt's ability to prove causation.  Instead of pointing out facts on which Precourt relies that are contested rather than undisputed, GOPAC bases at least some of its argument on other facts, drawn from its own statement of material facts.

Notwithstanding the somewhat confusing manner in which Count II has been litigated, Precourt's motion for summary judgment must be denied for a relatively straightforward reason: her failure to produce any evidence on one element of her claim. Liability under Section 402A of the Restatement hinges on the allegedly defective product's "reach[ing] the user or consumer without substantial change in the condition in which it is sold." Precourt has produced no evidence that Black was sickened by a product that reached her without a substantial change in condition between the time it left GOPAC and the time it came into her possession. She does not even address that element of her claim.

Moreover, without going into great detail, she identifies the following undisputed material facts: (1) GOPAC operates a beef slaughter and fabrication establishment, see Pl.'s Mem. of Law (doc. no. 57-1), at 3; (2) Fairbank is a manufacturer and processor of beef products, see id.; and (3) raw beef from GOPAC was only a portion of the beef Fairbank used to manufacture the ground beef product it shipped to Shaw's and Shaw's sold to Black, see id. at 3-4. Because Precourt has not established that the beef trim GOPAC supplied to Fairbank was not substantially changed before it reached Black and, in fact, seems to produce undisputed evidence that GOPAC's beef trim was

substantially changed through the process of manufacture and combination with other beef at Fairbank's facility, Precourt is not entitled to summary judgment on her strict-liability claim against GOPAC.

### C. Document No. 58

In document no. 58, Fairbank and Shaw's (collectively "Fairbank") move for summary judgment on their four crossclaims for contribution and indemnity against GOPAC.  In reliance upon both pretrial rulings and the jury verdict in the Maine case, Fairbank argues that collateral estoppel precludes GOPAC from re-litigating whether: (1) the Fairbank Guarantee is the controlling contract between Fairbank and GOPAC; (2) GOPAC violated the Fairbank Guarantee by selling Fairbank contaminated beef; and (3) Fairbank acted reasonably, for purposes of N.H. Rev. Stat. Ann. ("RSA") § 382-A:2-715, when it used GOPAC's contaminated beef.  Fairbank further argues that it is undisputed that GOPAC was the source of the E. coli O157:H7 that sickened Black, and concludes by arguing that because it is undisputed that Precourt's damages arose from the same fault found in the Maine case, it is entitled to summary judgment on all four of its claims for contribution and indemnity.

GOPAC's objection does not precisely track Fairbank's memorandum of law.  Rather, GOPAC argues that: (1) Fairbank has

failed to establish that the ground beef Black consumed contained any GOPAC beef, much less any GOPAC beef contaminated with E. coli O157:H7; (2) it is not collaterally estopped from litigating the issue of whether it sold Fairbank contaminated beef that subsequently sickened Black; and (3) it is not collaterally estopped from litigating the issue of whether Fairbank acted unreasonably.  GOPAC does not, however, challenge Fairbank's argument that it is collaterally estopped from litigating either the applicability of the Fairbank Guarantee or its violation of that guarantee.

    Much in this case is undisputed, or beyond re-litigation. The undisputed facts, however, do not include the existence of an unbroken chain of causation linking GOPAC to Black's illness and death, which Fairbank must establish before it can prevail on any of its four crossclaims for contribution and indemnity.

    Here is what is undisputed: (1) Black died as a result of consuming ground beef that was sold to her by Shaw's, processed by Fairbank, and contaminated by E. coli O157:H7; (2) GOPAC shipped beef trim to Fairbank that was contaminated with E. coli O157:H7; (3) the CDC determined that Black's illness was part of the Northeast Outbreak, a cluster of illnesses from E. coli O157:H7 that also included the illnesses of Long and Smith; and (4) the E. coli O157:H7 that sickened Black was a genetic match

to the E. coli that sickened both Long and Smith.  In the Maine
case, the jury found that the contaminated beef GOPAC delivered
to Fairbank was the source of the E. coli O157:H7 that sickened
Long and Smith.  In Fairbank's view, the undisputed facts
recounted above, in conjunction with the jury verdict in the
Maine case, entitle it to judgment as a matter of law that the
contaminated beef GOPAC delivered to Fairbank was also the
source of the E. coli O157:H7 that sickened Black.

     There is nothing wrong with the logic underpinning
Fairbank's argument, and Fairbank has produced some evidence
that supports it.  A jury might well be persuaded by it.  At
summary judgment, however, the problem is that Fairbank's
argument relies on facts that Fairbank has not produced.
Specifically, that argument can only be the basis for summary
judgment on Fairbank's crossclaims so long as there is also
undisputed evidence that: (1) illnesses from E. coli O157:H7
that are part of the same CDC cluster necessarily spring from
the same original source; or (2) samples of E. coli O157:H7 with
genetics that match – whatever that may mean – necessarily
originated from the same source.  Fairbank has produced no
evidence to establish either of those two propositions, much
less undisputed evidence.  Moreover, GOPAC has produced evidence
to the contrary in the form of trial testimony in the Maine case

concerning the person in California who ate no beef at all, but was still sickened by E. coli O157:H7 that genetically matched the E. coli that sickened Black, Long, and Smith.  See Def.'s Obj., Ellenbecker Aff., Ex. B (doc. no. 82-3), at 32-33. Because Fairbank has not produced undisputed evidence linking Black's illness and death to the beef trim GOPAC delivered to Fairbank, it is not entitled to summary judgment on its crossclaims.

Having denied Fairbank summary judgment on its crossclaims, the court does not need to address the collateral estoppel arguments Fairbank makes in its memorandum of law.  But, because those arguments are likely to arise in the run-up to trial, the court may as well address them now, as they have been fully briefed.  Fairbank argues that GOPAC is collaterally estopped from litigating three issues: (1) the applicability of the Fairbank Guarantee; (2) GOPAC's violation of that guarantee; and (3) the reasonableness of its failure to discover the E. coli O157:H7 in GOPAC's beef trim before using it to manufacture ground beef.  Based on its objection to summary judgment, GOPAC appears to concede that it is collaterally estopped from litigating the first two issues, and argues only that it is entitled to re-litigate the Maine jury's finding that "Fairbank acted as a reasonable buyer in using the adulterated raw beef

delivered by GOPAC in September 2009," Stevens Aff., Ex. F (doc. no. 60-6), at 2, a finding that appears to be relevant to Count Two of Fairbank's crossclaim, in which it seeks contribution and indemnity from GOPAC for Precourt's claim for breach of warranty.

"[C]ollateral estoppel bars re-litigation of any issues that were, or could have been, brought in a previous action for which judgment was rendered." Núñéz Colón v. Toledo Dávila, 648 F.3d 15, 19 (1st Cir. 2011) (citing Barreto-Rosa v. Varona-Mendez, 470 F.f3d 42, 45 (1st Cir. 2006)).

> The doctrine [of collateral estoppel] serves the twin goals of "protecting litigants from the burden of relitigating an identical issue" and "promoting judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979). Collateral estoppel may be applied where "(1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment." Ramallo Bros. Printing, Inc. v. El Dia, Inc., 490 F.3d 86 [,90] (1st Cir. 2007).

Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 770 (1st Cir. 2010) (parallel citations omitted).

Here, Fairbank has established all four of the elements described in Rodríguez-García. GOPAC concedes as much, focusing its argument on another factor, its assertion that it did not have a full and fair opportunity, in the Maine case, to litigate

the question of the reasonableness of Fairbank's actions
(hereinafter "the reasonableness issue").  GOPAC's argument is
unavailing.

In the discussion of collateral estoppel in its memorandum
of law, Fairbank states that for the doctrine to apply, "a party
must have 'had a full and fair opportunity for judicial
resolution of the same issue' in the prior litigation."  Def.'s
Mem. of Law (doc. no. 59), at 8-9 (quoting Rodríguez-García, 610
F.3d at 771).  While fairness is always an issue in the
application of collateral estoppel, there is a lower risk of
unfairness where, as here, a party relies on mutual rather than
non-mutual collateral estoppel.  See Acevedo-Garcia v. Monroig,
351 F.3d 547, 573 (1st Cir. 2003).  In any event, GOPAC takes
the fairness requirement and runs with it, arguing that it did
not have a full and fair opportunity to litigate the
reasonableness issue in the Maine case because Judge Singal: (1)
granted a motion in limine that precluded it from introducing
evidence concerning product recalls by Fairbank in 2002, 2007,
and 2009; and (2) ruled that it could not introduce evidence on
Fairbank's finished product testing procedures.  There are two
problems with GOPAC's argument against the application of
collateral estoppel.

First, there is a big difference between receiving an unfavorable evidentiary ruling and not receiving a full and fair opportunity to litigate an issue.  A party may have a full and fair opportunity to litigate an issue on which it does not prevail.  That happens every day, and that is what happened here.

"Once a party is afforded a hearing on an issue that comports with due process, courts will further question the hearing's fairness for the purposes of applying issue preclusion only in certain categories of cases in which fairness concerns are especially pronounced."  18 James Wm. Moore, Moore's Federal Practice § 132.04[1][a][iii], at 132-143 (3d ed. 2011).  Here, there is no doubt that the Maine trial afforded GOPAC due process.  To its credit, GOPAC does not argue to the contrary.

As for the categories of cases in which further scrutiny may be given to the fairness of an earlier proceeding, Moore's points out:

> Traditionally, courts have been receptive to claims of unfairness when:
>
> 1.   The series of proceedings raising the issue preclusion question involved different forums that afforded litigants disparate measures of procedural protection;
>
> 2.   The prevailing party concealed material information in the first case; or

     3.    The issue was not clearly relevant to the initial
           litigation; therefore the party being estopped
           had no incentive to litigate vigorously the
           question in the first instance.

Moore's, supra, § 132.04[1][a][iii], at 132-144.  The

circumstances of this case fit into none of the three categories

described above.  The trial in the Maine case offered GOPAC the

very same procedural protections available in this case.  There

is no suggestion that Fairbank concealed material information in

the Maine case.  The reasonableness issue was necessarily

relevant to the Maine case; the jury made an express finding on

that issue in its special verdict form.

     In Jack Faucett Associates, Inc. v. American Telephone &

Telegraph Co., 744 F.2d 118 (D.C. Cir. 1984), an opinion on

which GOPAC places great weight, the court explained:

     In Parklane Hosiery, the Court identified four
    examples in which the application of offensive
    estoppel would be "unfair".  Offensive estoppel should
    not be applied:

        (1) where the party asserting it easily could
        have joined in the action upon which reliance is
        placed;

        (2) where the party against whom it is to be
        applied had no incentive to defend vigorously the
        first action;

        (3) where the second action offers procedural
        opportunities unavailable in the first action;

        (4) where the judgment relied on is inconsistent
        with other decisions.

> Parklane Hosiery, 439 U.S. at 328-31.  These examples
> do not constitute an exhaustive list.  Id. at 331.

744 F.2d at 125-26 (parallel citations omitted).  The

circumstances of this case do not line up with any of the four

examples identified by the Supreme Court in Parklane Hosiery.

The first example is irrelevant, as Fairbank was a party to the

Maine case and is relying on mutual rather than non-mutual

collateral estoppel.  The second and third examples are

identical to two of the categories identified in Moore's and

discussed above.  As to the fourth example, there is no other

decision inconsistent with the judgment in the Maine case.

Moreover, GOPAC identifies nothing about the Maine trial that

was similar enough to the Parklane Hosiery examples to have made

that trial so unfair that its jury verdict on the reasonableness

issue should not be applied to this case.

The "unfairness" GOPAC identifies consists exclusively of

two of Judge Singal's evidentiary rulings, which GOPAC is free

to challenge on appeal.  The availability of appeal to correct

evidentiary errors in the Maine trial – and this court is not

suggesting that there were any such errors – points up the

second problem with GOPAC's argument.  As previously noted,

GOPAC places great reliance on Jack Faucett, in which the D.C.

Circuit held that the trial court abused its discretion when it

granted the plaintiff's motion for offensive collateral
estoppel.  744 F.2d at 131.  In that case, "AT&T vigorously
argue[d] that it was denied a full and fair opportunity to
litigate its liability in Litton [a previous case involving
AT&T] because the Litton trial judge erroneously excluded
[certain] evidence."  Id. at 127.  The court of appeals was
"persuaded by AT&T's argument that the existence of this
acknowledged error in the presentation of the case to the Litton
jury is a serious obstacle to the plaintiffs' use of offensive
estoppel on the issue of AT&T's liability."  Id. at 128.  So,
theoretically, an evidentiary error by Judge Singal in the Maine
case could have some effect on the ability of Fairbank and
Shaw's to rely on collateral estoppel.

However, Jack Faucett has something that this case lacks:
an appellate determination that the trial court made an
evidentiary error.  In that case, "[t]he Second Circuit held
that [the] evidence [at issue] was relevant and that the trial
court had erred in excluding it."  744 F.2d at 128 (citation
omitted).  Here, in contrast, rather than pointing to an
appellate decision that Judge Singal made erroneous evidentiary
rulings, GOPAC asks this court to rule that he did so.  Unless
the First Circuit decides that Judge Singal erred, GOPAC has no
business asking this court to rule that it was denied a full and

fair opportunity to litigate the reasonableness issue against
Fairbank in the Maine case.  As the lack of a full and fair
opportunity to litigate that issue is GOPAC's only objection to
the application of collateral estoppel, the court rules that
GOPAC is collaterally estopped from re-litigating that issue in
this case.  In other words, in this case, it is established that
"Fairbank acted as a reasonable buyer in using the adulterated
raw beef delivered by GOPAC in September 2009."  Stevens Aff.,
Ex. F (doc. no. 60-6), at 2.

That said, collateral estoppel is not without potential
risks to Fairbank.  Specifically, while the judgment in the
Maine case is final for purposes of collateral estoppel, "it is
possible than an appellate decision [in GOPAC's favor in the
Maine case could] vitiate the finality required for issue
preclusive effect."  18 Moore's, supra, § 132.03[5][b], at 132-
130.  Whether it makes sense to run the risk of relying on
collateral estoppel, as opposed to proving the reasonableness
issue in this court, is Fairbank's decision to make.

   D. Document No. 53

In document no. 53, GOPAC moves for summary judgment on
Precourt's claims for breach of warranty (Count V), violation of
the CPA (Count XII), and enhanced compensatory damages (Count

27

XIV).  Precourt objects, categorically.  The court considers
each claim in turn.

### 1. Breach of Warranty

In Count V, Precourt asserts that GOPAC violated both
express warranties and the implied warranties of merchantability
and fitness for a particular use by placing into the stream of
commerce beef trim that was contaminated by E. coli O157:H7.
GOPAC argues that all of Precourt's breach-of-warranty claims
fail as a matter of law because she did not give notice before
filing them.  GOPAC further argues that Precourt's claim for
breach of the implied warranty of fitness for a particular
purpose fails on the merits.

### a. Notice

With respect to notice, New Hampshire's enactment of the
Uniform Commercial Code ("UCC") provides, in pertinent part:

Where a tender has been accepted

   (a) the buyer must within a reasonable time after he
   discovers or should have discovered any breach notify
   the seller of breach or be barred from any remedy.

RSA 382-A:2-607(3).  "Under New Hampshire law, the determination
of whether defendants received sufficient notice is ordinarily a
question of fact to be determined by a jury based on the
surrounding circumstances."  Dudley v. Bus. Express, Inc., 882
F. Supp. 199, 211 (D.N.H. 1994) (citing Russell v. First Nat'l

Stores, Inc., 96 N.H. 471, 475 (1951); Pineau v. White, 101 N.H.
119, 121 (1957); 4 Ronald A. Anderson, Uniform Commercial Code §
2-607:11 (1983 & Supp. 1993)).

In its memorandum of law, GOPAC asserted that Precourt
provided no notice of her warranty claims.  To her objection,
Precourt attached a copy of a letter from her counsel to the
president and CEO of GOPAC, dated July 20, 2010.  In that
letter, Precourt's counsel notified GOPAC of Precourt's
intention to pursue a claim based on Black's consumption of
contaminated ground beef and subsequent death.  In its reply,
GOPAC now appears to concede that Precourt did provide notice,
but argues that Precourt's notice was insufficient as a matter
of law.  In support of that argument, it cites Hazelton v. First
National Stores, Inc., 88 N.H. 409, 413 (1937).  In that case,
the New Hampshire Supreme Court reversed a jury verdict on a
breach-of-warranty claim against a grocery store from which one
of the plaintiffs purchased pork chops that gave her and her
family trichinosis.  See id. at 415.  The court held that the
plaintiffs' notice to the grocery store, coming six months after
they fell ill, was not notice within a "reasonable time," as
required by the statute then in force.  See id. at 414.

Hazelton does not support a ruling that Precourt's notice
to GOPAC was not given within a reasonable time.  First of all,

the UCC requires notice "within a reasonable time after [the buyer] discovers or should have discovered any breach" of warranty.  RSA 382-A:2-607(3).  GOPAC, however, does not say when Black or Precourt discovered, or should have discovered, a potential breach of warranty by GOPAC, as opposed to a breach by Shaw's or Fairbank.  Without that essential benchmark, it is impossible to determine whether the amount of time that passed before Precourt gave notice was reasonable.

Then there are the "surrounding circumstances."  Dudley, 882 F. Supp. at 211.  The defendant in Hazelton was the store from which one of the plaintiffs purchased the pork chops that sickened her family.  Here, in contrast, the path between plaintiff and defendant is substantially more complicated; Precourt's claim is that the contaminated beef originated with GOPAC but passed through Fairbank and Shaw's before getting to Black.  In other words, the holding in Hazelton might support an insufficient-notice defense mounted by Shaw's, if Shaw's had received notice when GOPAC did.  But, given the surrounding circumstances in this case, including the number of steps between Black and GOPAC and GOPAC's own assertion that "[i]n September 2009, Fairbank produced ground beef using beef materials provided by up to twenty-three different suppliers," Def.'s Obj. (doc. no. 83), at 2, the court cannot say, as a

matter of law, that Precourt did not provide notice to GOPAC within a reasonable time.

At trial, GOPAC may be able to mount a successful defense based on lack of sufficient notice.  But, at this point, GOPAC has not even said when Precourt discovered or should have discovered that GOPAC was a possible source of the contaminated beef Black consumed.  Thus, GOPAC has not produced undisputed evidence from which the court could conclude, as a matter of law, that Precourt delayed unreasonably before providing GOPAC with notice of her breach-of-warranty claims.

### b. Fitness for a Particular Purpose

With respect to the implied warranty of fitness for a particular purpose, New Hampshire's enactment of the UCC provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose.

RSA 382-A:2-315.  "By its terms, RSA 382-A:2-315 (1961) applies only if, at the time of sale, a seller knows or has reason to know . . . that the buyer is relying on the seller's skill or judgment."  Dalton v. Stanley Solar & Stove, Inc., 137 N.H. 467, 471 (citing Brescia v. Great Rd. Realty Trust, 117 N.H. 154, 158 (1977); 3 R. Anderson, Uniform Commercial Code § 315:16, at 294

31

(3d ed. 1983)).  That is, for the RSA 382-A:2-315 warranty to

arise in the first place, the buyer must have "rel[ied] on the

seller's skill or judgment to select or furnish suitable goods."

Brescia, 117 N.H. at 157 (citation omitted, emphasis added).

GOPAC argues that Precourt's claim for breach of the

implied warranty of fitness for a particular purpose fails

because: (1) it did not know about the particular purpose to

which its beef trim would be put (i.e., being processed into

ground beef as opposed to being used to manufacture beef stew or

spaghetti sauce); (2) Black did not have a "particular purpose"

for the ground beef she bought, as that term is defined in the

comments to RSA 382-A:2-315; and (3) there is no evidence that

Black ever relied on GOPAC's skill or judgment in selecting the

ground beef at issue.  Precourt disagrees, relying on GOPAC's

acknowledgement that it knew that Fairbank made ground beef for

human consumption from the beef trim it acquired from GOPAC, and

citing the New Hampshire Supreme Court's statement "that the

warranties of particular purpose and merchantability can, and

often do, coincide," Elliott v. Lachance, 109 N.H. 481, 484

(1969) (quoting 2 Frumer-Friedman, Products Liability §

19.03[2], at 503 (1968); citing R.D. Hursh, Annotation,

Liability of Manufacturer or Seller of Hair Preparations,

Cosmetics, Soaps and Other Personal Cleansers, and the Like, for

Injury Caused by the Product, 79 A.L.R.2d 431, 444 (1961)).
GOPAC's argument carries the day.

Count V makes no allegations of any sort regarding Black's
reliance on GOPAC's skill or judgment to select the ground beef
she purchased.  GOPAC raised that issue in its motion for
summary judgment.  Yet, in her objection, Precourt did not even
address that element of her claim, much less identify evidence
from which a jury could conclude that she had established it.
Accordingly, GOPAC is entitled to judgment as a matter of law on
Precourt's claim that it violated the implied warranty of
fitness for a particular purpose.

### 2. Violation of the CPA

In Count XII, Precourt asserts that GOPAC violated the CPA
by representing that its beef trim was fit for human consumption
when, in fact, it was contaminated with E. coli O157:H7.[5]  GOPAC
argues that it is entitled to summary judgment on Precourt's CPA
claim because none of its offending conduct occurred in New
Hampshire.  It relies on the undisputed facts that it fabricated
the beef trim at issue in Nebraska and shipped it to Fairbank in
New York and further argues that any representations made to

---

[5] Such conduct, if proven, would violate RSA 358-A:2, V
(proscribing the representation of goods or services as having
characteristics or qualities that they do not have) and/or RSA
358-A:2, VII (proscribing the representation of goods or
services as being of a particular standard, quality, or grade
when they are of another).

Black in New Hampshire were made by others.  In her objection,
Precourt relies on the New Hampshire Supreme Court's decision in
LaChance v. United States Smokeless Tobacco Co., 156 N.H. 88
(2007), for the propositions that the CPA should be construed
broadly and that indirect purchasers of products may bring
claims against manufacturers under the CPA.  Precourt further
argues that her position is supported by a string of decisions
from this court.  She is mistaken.

     The CPA bars the use of "any unfair method of competition
or any unfair or deceptive act or practice in the conduct of any
trade or commerce within this state."  RSA 358-A:2 (emphasis
added).  The statute includes the following relevant definition:

> "Trade" and "commerce" shall include the
> advertising, offering for sale, sale, or distribution
> of any services and any property, tangible or
> intangible, real, personal or mixed, and any other
> article, commodity, or thing of value wherever
> situate, and shall include any trade or commerce
> directly or indirectly affecting the people of this
> state.

RSA 358-A:1, II.

     While the CPA defines trade and commerce to include conduct
that affects the people of New Hampshire either directly or
indirectly, that definition does not eliminate the
territoriality requirement of RSA 358-A:2.  Even trade or
commerce that indirectly affects the people of New Hampshire
must still be "trade or commerce within this state," id., to be

unlawful under the CPA.  Thus, LaChance, on which Precourt
places great weight, is of no assistance.

In LaChance, after an extensive analysis, the New Hampshire
Supreme Court held that the plaintiffs, who were purchasers of
smokeless tobacco products from retail stores across New
Hampshire, 156 N.H. at 89, could bring a CPA claim against the
defendants, who manufactured smokeless tobacco products and
marketed them through in-store displays, id.  In so ruling, the
court rejected the defendants' argument that they could not be
sued under the CPA because the plaintiffs did not buy directly
from them, but bought from the retailers in whose stores the
defendants placed their in-store displays.

Apropos of the issue in this case, LaChance did not involve
any argument by the defendants that their offending conduct did
not take place in New Hampshire and, in fact, the plaintiffs
alleged that the defendants, among other things, "'intentionally
and routinely' removed competitors' racks from retail stores [in
New Hampshire] and entered into agreements with [New Hampshire]
retailers to restrict the sale, advertising and display of
competing brands, as well as gave [New Hampshire] retailers
incentives to exclude competing brands from stores," id. at 89-
90.  Because LaChance involved offending conduct in New
Hampshire, its holding about indirect purchasers has no bearing

on the issue in this case, which is the locus of the conduct on which Precourt's CPA claim is based.

The determinative question, then, is whether Precourt has alleged any conduct by GOPAC within New Hampshire.  GOPAC contends, without opposition, that it processed beef in Nebraska and shipped it to New York and, thus, engaged in no offending conduct in New Hampshire.  Of course, the offending conduct alleged in Count XII is not processing beef or shipping it; Precourt asserts that GOPAC violated the CPA by making false representations about the quality of its beef.  Still, for GOPAC to be liable under the CPA, it must have made those alleged misrepresentations within New Hampshire.

On this issue, Judge DiClerico's decision <u>Environamics Corp. v. Ferguson Enterprises, Inc.</u> is instructive.  In that case, a New Hampshire plaintiff claimed that a Virginia defendant violated the CPA by, among other things, "shipping a pump to Environamics that was contaminated with hazardous materials, with documentation representing that it had been decontaminated."  No. Civ. 00-579-JD, 2001 WL 1134727, at *3 (D.N.H. Sept. 24, 2001).  Ferguson moved to dismiss the CPA claim, arguing that the conduct on which Environamics based its claim "did not occur within New Hampshire, as required by RSA 358-A:2."  <u>Id.</u> at *4.  Judge DiClerico disagreed:

The limitation in RSA 358-A:2 to "conduct of any trade
or commerce within this state" has been interpreted to
mean that the statute only applies to offending
conduct that took place within New Hampshire.  <u>See</u>
<u>Pacamor Bearings, Inc. v. Minebea Co., Ltd.</u>, 918 F.
Supp. 491, 504 (D.N.H. 1996).  In count XIII,
Environamics alleges that Ferguson engaged in
offending conduct when it shipped a contaminated pump
with documentation representing that it had been
decontaminated.  Since Ferguson is a Virginia
corporation with a principal place of business in
Virginia, it appears from the complaint that the pump
was shipped from Virginia.  However, the deceptive act
of misrepresenting the condition of the pump occurred
in New Hampshire when Environamics received the pump
and its allegedly false documentation.

<u>Id.</u>

Based on <u>Environamics</u>, GOPAC might be liable in New York
for misrepresenting the quality of its beef trim, but Precourt
does not allege GOPAC shipped anything to New Hampshire or made
any representations to anyone in New Hampshire.  Rather, it
alleges that GOPAC represented that its beef trim was fit for
human consumption when shipping that beef to a New York company
that was known to distribute its own products, incorporating
GOPAC's beef, within the State of New Hampshire.  Judge
DiClerico's ruling in <u>Environamics</u> provides <u>no</u> support for the
proposition that a seller may be liable for a misrepresentation
about the quality of its goods not just in the place where that
seller's buyer receives the misrepresentation but, also, in any
location to which that buyer may later send the goods it
received in conjunction with the initial seller's

misrepresentation.  In sum, if GOPAC misrepresented the quality
of its beef trim, it did so in Nebraska and New York, but, on
the facts alleged by Precourt, it did not do so in New
Hampshire.  Accordingly, GOPAC is entitled to judgment as a
matter of law on Count XII.

### 3.  Enhanced Compensatory Damages

Count XIV is a claim for enhanced compensatory damages,
based on an allegation that GOPAC acted "wantonly meaning with
reckless indifference to the potential consequences of its
actions including the illness, injury, suffering and untimely
and unexpected death of the plaintiff's decedent."  Second Am.
Compl. (doc. no. 105) ¶ 74.  GOPAC argues that Black's claim for
enhanced compensatory damages fails as a matter of law because
her claim defines "wanton" to mean "with reckless indifference,"
and the New Hampshire Supreme Court has held that neither
negligent nor reckless conduct is sufficient to entitle a
plaintiff to enhanced compensatory damages.  In response,
Precourt "acknowledges that under New Hampshire law a claim for
enhanced damages is not a separate cause of action, but instead
is a legitimate request for a particular remedy."  Pl.'s Mem. of
Law (doc. no. 69), at 18 (citing Minion Inc. v. Burdin, 929 F.
Supp. 521, 523 (D.N.H. 1996)).  For that reason, and in the

interest of streamlining this case just a bit, Counts XIV and XV
are both dismissed.

That said, GOPAC's parsing of paragraph 74 of Precourt's
amended complaint, without more, is not enough to take the issue
of enhanced compensatory damages away from the jury.  "An award
of enhanced compensatory damages for any tort . . . must be
based on an allegation and proof of wanton, malicious, or
oppressive conduct."  McKinnon v. Harris, No. Civ. 1:05-CV-93-
JAW, 2005 WL 2335350, at *2 (D.N.H. Sept. 21, 2005) (citing,
inter alia, Figlioli v. R.J. Moreau Cos., 151 N.H. 618, 620-22
(2005); Aubert v. Aubert, 129 N.H. 422, 431 (1987); Crowley v.
Global Realty, Inc., 124 N.H. 814, 818-19; (1984); Johnsen v.
Fernald, 120 N.H. 440, 441 (1980); Munson v. Raudonis, 118 N.H.
474, 478-79 (1978)); see also Stewart v. Bader, 154 N.H. 75, 87
(2006).  GOPAC does not argue that Precourt has failed to allege
conduct that a jury could find to be "wanton," nor has it even
attempted to produce uncontested evidence that its conduct was
not wanton, malicious, or oppressive.  Rather, it merely finds
fault with Precourt's definition of "wanton."  If the evidence
at trial is sufficient to warrant an instruction on enhanced
compensatory damages, the jury will be given an instruction with
proper definitions of the relevant terms.  If the evidence is
insufficient, as a matter of law, the jury will not be

instructed on enhanced compensatory damages.  At this point,
however, GOPAC has given the court no reason to eliminate
enhanced compensatory damages as a form of relief potentially
available to Precourt.  Accordingly, while Counts XIV and XV are
dismissed because they do not state a cause of action, enhanced
compensatory damages remain in play.

### 4. Document No. 53 Summary

To summarize: (1) GOPAC is entitled to judgment as a matter
of law on Precourt's claim that it violated the implied warranty
of fitness for a particular purpose, but not the other warranty
claims stated in Count V; (2) GOPAC is entitled to judgment as a
matter of law on Precourt's CPA claim; and (3) GOPAC is entitled
to dismissal of Counts XIV and XV, but is not entitled to
judgment as a matter of law that Precourt is barred from
recovering enhanced compensatory damages.

### Conclusion

For the reasons described above: (1) GOPAC's first motion
for summary judgment, document no. 53, is granted in part and
denied in part; (2) Precourt's motion for partial summary
judgment, document no. 57, is granted as to Fairbank and Shaw's
but denied as to GOPAC; (3) Fairbank's motion for summary
judgment, document no. 58, is denied; and (4) GOPAC's second
motion for summary judgment, document no. 73, is denied.

As a result of the foregoing rulings, this lawsuit has been diminished somewhat.  Counts XII, XIV, and XV are gone, but, as explained above, Precourt may still introduce evidence to establish her right to enhanced compensatory damages.  The claim for breach of the implied warranty of fitness for a particular purpose has been eliminated from Count V, the rest of Count V remains.  Finally, while liability has been established for Counts I and III, the amount of Precourt's damages remains to be determined.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge


March 5, 2012

cc:  Paula J. Clifford, Esq.
     Christopher P. Dombrowicki, Esq.
     Andrew D. Dunn, Esq.
     Stephen P. Ellenbecker, Esq.
     D. Pattesron Gloor, Esq.
     Robert E. Mazow, Esq.
     Brian D. Nolan, Esq.
     Stephen J. Schulthess, Esq.
     Shawn K. Stevens, Esq.
     Ralph A. Weber, Esq.